UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

TAMMY L. WEST,

                        Plaintiff,

v.                                              Case No.  5:04-cv-410-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                        Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 11) and both parties have filed briefs outlining their respective positions.  (Docs. 16 & 17.)  For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on August 22, 2001, claiming a disability onset date of February 24, 2000. (R. 49-52.)[2]  Plaintiff's application was denied initially (R. 42-43), and upon reconsideration. (R. 37-38.)  Thereafter, Plaintiff timely pursued her administrative remedies available

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

[2] Plaintiff's application was filed in the name of Tammy Linn Olsen, but she married before the administrative hearing and changed her name to Tammy West. (R. 300-01.)

before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 36.)  The ALJ conducted Plaintiff's administrative hearing on August 23, 2002. (R. 297-332.)  Plaintiff was without legal counsel at the hearing.  The ALJ issued a decision unfavorable to Plaintiff on October 3, 2002 (R. 14-22.)  Plaintiff timely filed a request for review with the Social Security Administration's Office of Hearings and Appeals.  (R. 271.)  Plaintiff submitted additional evidence to the Appeals Council in support of her claims.  (R. 271-96.)  The Appeals Council denied Plaintiff's request for review on July 15, 2004.  (R. 3-6.)  On September 8, 2004, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

### III. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[3] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[4]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the

---

[3] *See* 42 U.S.C. § 405(g).

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Commissioner's decision.[5] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[6] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[11]  Second, if a claimant does not have any impairment or combination of impairments which

---

[5] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[6] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[7] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[12] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[13] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[14] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[17] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[18]

---

[12] 20 C.F.R. § 404.1520(c).

[13] 20 C.F.R. § 404.1520(d).

[14] 20 C.F.R. § 404.1520(e).

[15] 20 C.F.R. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[17] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[18] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[19] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[22] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[23]

## IV. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born on August 9, 1967.  (R. 49.)  She was 32 years old at the onset of her alleged disability (*Id.*), and 35 years old when the ALJ rendered his decision in this case.  (R. 14-22.)  Plaintiff has a high school education.  (R. 314.)  She worked as a

---

[19] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[20] Walker at 1003.

[21] Wolfe at 1077-78.

[22] *See id.*

[23] *See* Doughty at 1278 n.2.

secretary and administrative assistant until February 2000, when she contends that she was no longer able to work due to migraine headaches, neck pain and forgetfulness caused by pain.  (R. 54, 302-04, 306.)

The ALJ determined that claimant suffers from migraine/tension headaches, cervical pain syndrome and hypothyroidism.  (R. 17.)   However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.  (*Id.*)

The ALJ then found that Plaintiff had no physical limitations and could perform her past relevant work. (R. 20-22.)  In reaching this conclusion, the ALJ found that Plaintiff's allegations regarding her limitations were not consistent with the medical evidence, and therefore not fully credible.  (R. 21.)   Additionally, after considering the objective laboratory and clinical findings, the ALJ found that Plaintiff's subjective complaints were beyond those, which could reasonably be expected in terms of intensity, frequency or duration.  (*Id.*)

In August 2000, Plaintiff began treatment with Dr. Reginald Bowden.  (R. 193-94.) In September 2000, Plaintiff reported to Dr. Bowden severe headaches associated with a lump on the right side of her cheek.  (R. 190, 192.)  Dr. Bowden believed that Plaintiff's headaches were related to temporomandibular joint syndrome[24] and instructed Plaintiff to follow up with a dentist. (*Id.*)  There is no evidence of treatment by a dentist or specialist for this problem.

---

[24] A disturbance of the joint between the lower jawbone and the skull, marked by pain in the joint and the ear.  *See* 5-T-TG <u>Attorneys' Dictionary of Medicine </u>932.

Plaintiff had follow-up appointments with Dr. Bowden on September 21, 2000 and November 20, 2000. (R. 187-90.) On November 20, 2000, Plaintiff complained of severe headaches which had become more frequent and severe. (R. 187.) Plaintiff stated that she was getting headaches every 3-4 days and that she was having associated nausea, vomiting and photophobia. (*Id.*) Dr. Bowden ordered a cranial CT scan and MRI, both of which were unremarkable. (R. 186, 191.)

In September, November and December 2000, Plaintiff was examined and treated at Halifax Medical Center emergency department (hereinafter "Halifax") for symptoms associated with migraine headaches. (R. 153-59.) On each visit she was given intramuscular injections of Demerol and Phenergan and released the same day in improved condition. (*Id.*)

On January 5, 2001, Dr. Bowden noted that Plaintiff was still complaining of severe headaches and referred her to a neurologist, Dr. Timothy Wierzbicki. (R. 214, 181-84.) On January 25, 2001, Dr. Wierzbicki examined Plaintiff. (R. 181-84.) Plaintiff reported that she has been a migraine sufferer since childhood and that she has had a variety of headaches over the course of the past 20 years. (R. 181.) Plaintiff reported that she has suffered from two types of headaches since April 2001. (*Id.*) The maximal and more migrainous appearing headache occurred in the area of the right occiput and tended to radiate to the right eye. (*Id.*) Dr. Wierzbicki noted that Plaintiff suffered from classic migraine symptoms -- i.e., nausea, vomiting, photophobia, and phonophobia. (*Id.*) The other type of headache was a chronic daily low grade headache in the same location as the other headache but without migraine symptoms. (*Id.*) Dr. Wierzbicki noted various risk factors for Plaintiff's headaches which included a motor vehicle accident when she was 17 years old,

chronic sinus infections, poor sleep, stress and smoking one and a half packs of cigarettes a day.  (R. 182.)

Dr. Wierzbicki opined that there were other available treatment options for Plaintiff's headache management.  (R. 183.) Dr. Wierzbicki prescribed a Prednisone taper schedule along with Fiorinal with codeine for breakthrough headache pain and Pamelor for headache prophylaxis.  (R. 184.)  Dr. Wierzbicki advised Plaintiff that in order to manage her migraines she would need to quit smoking and reduce the amount of over-the-counter analgesics she had been taking.  (*Id.*)

On February 15, 2001, Plaintiff had a follow-up appointment with Dr. Wierzbicki. (R. 178.)  Plaintiff reported that she stopped her course of steroids because she could not tolerate them.  (*Id.*)  Dr. Wierzbicki opined that long-term steroid use could have benefited Plaintiff.  (*Id.*)  Dr. Wierzbicki noted that Fiorinal has been the only drug that has helped Plaintiff.  (*Id.*)  He also advised Plaintiff to use Benadryl to enhance her sleep. (R. 179.)

Dr. Wierzbicki ordered cervical spine radiographs to evaluate Plaintiff's neck condition.   (R. 180, 184.)  On follow-up, Dr. Wierzbicki noted that the radiographs of Plaintiff's cervical spine showed a significant amount of straightening of the normal cervical lordosis, which may be part of the generator of her headache condition. (R. 177.)  Dr. Wierzbicki also noted that he was "not sure how severe her headache pain really is" because it did not appear to be impairing her abilities to go out and do the things she enjoys.  (*Id.*) Dr. Wierzbicki noted that despite her complaints of pain, Plaintiff was beginning a motorcycle training course.  (R. 177.)   Plaintiff reported that she was still smoking a half a pack of cigarettes a day and sleeping five to six hours per night.  (*Id.*)  Dr. Wierzbicki suggested that Plaintiff continue to work on her migraine triggers, which included

8

sleep, stress level and cigarette smoking.  (*Id.*)  He also suggested that Plaintiff take Benadryl on a daily basis for sleep.  (*Id.*)

On March 7, 2001, Plaintiff presented herself at Halifax complaining of headaches that had lasted approximately eleven months.  (R. 212-13.)  Plaintiff was given intramuscular injections of Demerol and Compazine and released the same day. (*Id.*)  On March 20, 2001, Dr. Wierzbicki admitted Plaintiff to Halifax for treatment of her persistent chronic daily migraine.  (R. 215.)  Plaintiff's migraine responded favorably to DHE 45 after three days of treatment and she was discharged in good condition with prescriptions for Depakote and DHE 45.  (*Id.*)

On April 10, 2001 Plaintiff had a follow-up appointment with Dr. Wierzbicki. (R. 176.)  Dr. Wierzbicki reported that Plaintiff was feeling better since being hospitalized for DHE headache management.  (*Id.*)  Dr. Wierzbicki opined that Plaintiff's complaints of poor sleep were likely attributable to her environment.  (*Id.*)  She was living in a trailer home with a group of friends and there was too much noise and "excessive things" were happening during the evening.  (*Id.*)  Plaintiff reported that she had tapered her cigarette usage to about 5-7 cigarettes per day, but that her stress level remained moderate to severe.  (*Id.*)  Dr. Wierzbicki recommended that she cut back on her caffeine consumption. (*Id.*)  Dr. Wierzbicki noted that Plaintiff had persistently hypertrophic muscles in the splenus capitis muscle group bilaterally. (*Id.*)

On May 31, 2001, Plaintiff saw Dr. Wierzbicki for a follow-up appointment.  (R. 174.) Plaintiff reported that her headaches were doing better, with severe migraine attacks every five days.  (*Id.*)  Plaintiff complained of daily chronic neck pain, which Dr. Wierzbicki believed to be a primary contributor to her migraines.  (*Id.*)  Dr. Wierzbicki

noted that Plaintiff's sleep improved when she took the Ambien as prescribed. (*Id.*)  Dr. Wierzbicki also noted that despite his recommendations, Plaintiff continued to smoke about a half a pack of cigarettes and drink about six cups of coffee per day.  (*Id.*)  Dr. Wierzbicki further noted that Plaintiff tends to run out of her medication, and rather than calling for a refill she waits until the next appointment.  (*Id.*)  At this appointment, Plaintiff had run out of both Pamelor and Ambien.  (*Id.*)  Dr. Wierzbicki also noted that Plaintiff's stress level remained high because she was in the process of building a home.  (*Id.*)

On July 5, 2001, Plaintiff had a botulinum toxin block of the neck area.  (221-22.)  On follow-up, Dr. Wierzbicki noted that Plaintiff's headaches were improved, with one headache occurring every seven days. (R. 172.)  However, Dr. Wierzbicki noted that Plaintiff mismanaged the timing of her headache treatments. (*Id.*)

On August 22, 2001, Plaintiff had an unremarkable MRI examination of the cervical spine.  (R. 171.)  On follow-up, Dr. Wierzbicki interpreted the MRI as showing a stable cervical spine with no evidence of cervical canal stenosis or any nerve entrapment problems and normal curvature of the cervical spine.  (R. 169.)

On August 26, 2001, Plaintiff presented herself at Halifax complaining of neck pain after a migraine.  (R. 211.)  She was diagnosed with right occipital nerve muscle spasm.  (*Id.*)  Plaintiff was given an injection with Marcaine and 1% Lidocaine and Celestone and discharged that same day.  (*Id.*)

On September 10, 2001, Dr. Wierzbicki noted that Plaintiff's headaches continue to be a problem "mainly due to noncompliance issues."  (R. 169).  Dr. Wierzbicki noted that Plaintiff had stopped taking Pamelor for no apparent reason.  (*Id.*)  Additionally, Plaintiff was not taking any medication to help with sleep due to the cost of Ambien.

10

(*Id.*)  Dr. Wierzbicki noted that Plaintiff was in the process of relocating to Ocala and was spending a fair amount of time traveling back and forth.  (*Id.*)  Plaintiff advised Dr. Wierzbicki that her neck pain was aggravated by riding her motorcycle or driving a car, but that it tended to be better if she was a passenger.  (*Id.*)

On November 1, 2001, Dr. Wierzbicki noted that Plaintiff's headaches have somewhat improved with simple measures to improve her sleep.  (R. 168).  He further noted that the Imitrex had become a powerful tool to treat her big headaches.  (*Id.*)  Plaintiff reported that she was sleeping at least eight to ten hours per night.  (*Id.*)  Dr. Wierzbicki recommended that Plaintiff use a cervical pillow and continue to reduce her cigarette smoking.  (*Id.*)

On December 17, 2001, Dr. Wierzbicki noted that although Plaintiff's headaches "appear to be behaving themselves", she had developed neck tightness and pain. (R. 167.)   He noted that her neck pain appears to be focal in the mid-section of her neck, with some point tenderness in the scalp region. (*Id.*)   Dr. Wierzbicki recommended that Plaintiff undergo chiropractic manipulation.  (*Id.*)

At her March 5, 2002 appointment, Plaintiff reported increased headaches which appeared to coincide with a recent chiropractic treatment. (R. 166.)[25]  She also reported that she was sleeping poorly.  (*Id.*)  Dr. Wierzbicki noted that Plaintiff had stopped taking Zanaflex because she could not afford a refill.  (*Id.*)  He also directed Plaintiff to stop taking Imitrex due to her reports of chest pain.  (*Id.*)  When asked about the other

---

[25] At the hearing, Plaintiff testified that she did not go to a chiropractor because she did not have the money.  (R. 317).  Plaintiff testified that one of her friends, who is a chiropractor, tried the "thumper" on her at a Native American Pow Wow and that it made her neck worse. (*Id.*)

aspects of her health, Plaintiff advised Dr. Wierzbicki that she had been participating in Bike Week over the past seven days.  (*Id.*)  Plaintiff also reported that she was still smoking at least a pack of cigarettes per day.  (*Id.*)  Dr. Wierzbicki noted that her stress level appears to vacillate around her lifestyle.  (*Id.*)  Dr. Wierzbicki opined that Plaintiff's headache problems would likely be persistent given the "more lifestyle-based issues." (*Id.*)  Dr. Wierzbicki noted that based on a recent spell of hypoglycemia, he would send Plaintiff for a five-hour glucose tolerance test because her headaches could be aggravated by hypoglycemia.  (*Id.*)

On June 24, 2002, Plaintiff had a follow-up appointment with Dr. Wierzbicki.  (R. 165.)  Dr. Wierzbicki noted that Plaintiff's primary problem was cervicogenic muscular ache which appears to range from moderate to severe on a daily basis.  (*Id.*)  He noted that her neck aggravation coincided with a chiropractic manipulation[26] and abruptly stopping Zanaflex.  (*Id.*)  Dr. Wierzbicki also noted that Plaintiff's headaches were fairly mild to moderate and she did not "typically have severe migraines most of the time." (*Id.*)  Dr. Wierzbicki stated that this improvement came despite Plaintiff stopping her Pamelor medication.  (*Id.*)  On July 22, 2002, Dr. Wierzbicki wrote a letter regarding Plaintiff's application for disability.  (R. 164.)  Dr. Wierzbicki opined that based on Plaintiff's severe neck pain and recurring migraine headaches it would be difficult for Plaintiff to maintain a steady work schedule. (*Id.*)

There is a physical residual functional capacity ("RFC") assessment of record which was performed by a non-examining state agency physician.  (R. 263-70.)   Alan

---

[26] *See* footnote 25.

G. Tetlow, MD., performed an assessment on April 4, 2002.  (*Id.*)  In view of the medical records, Tetlow stated that Plaintiff had no significant exertional, postural, manipulative, visual or communicative limitations that would preclude her from performing her past relevant work.  (*Id.*)

At the hearing, Plaintiff testified that she has daily headaches and that they worsen as the day progresses. (R. 315.)  Plaintiff further testified that she suffers from severe neck pain and that on a pain scale of one to ten, the pain is between an eight and a ten. (R. 324.)  Plaintiff testified that she was experiencing that level of pain during the hearing.  (R. 325.)  She testified that her neck pain radiates from both sides of her neck, down her back and into her shoulder blades.  (R. 325-26.)  Plaintiff testified that she is still smoking cigarettes but that she had cut down from two to three packs per day to a half pack or full pack per day. (R.327.)

## V. **DISCUSSION**

Plaintiff raises three issues on appeal.  First, Plaintiff contends that the ALJ erred by failing to notify Plaintiff of her right to counsel, failing to develop the record and failing to order medical tests and examinations.  Second, Plaintiff argues that the ALJ erred by rejecting Plaintiff's pain testimony in light of the substantial evidence supporting cervical pain syndrome and migraine headaches.  Third, Plaintiff argues that the Appeals Council erred by denying Plaintiff's request for review after Plaintiff submitted new and material evidence regarding pain.

### A. **Plaintiff effectively waived her right to legal representation**

Plaintiff argues that the ALJ failed to fully apprise her of her right to counsel by not informing her of her options regarding representation. Plaintiff offers no argument as to how her lack of representation was prejudicial to her claim. Plaintiff merely states that the ALJ failed to develop the record and order medical tests and examinations.  For the reasons discussed below, the Court rejects Plaintiff's argument.

Although there is no constitutional right to counsel at a Social Security hearing, a claimant for social security benefits has a *statutory* right to counsel, which can be waived.[27] The Commissioner must notify the claimant of her right to be represented at the hearing before the ALJ.[28] Waiver of one's right to counsel must be knowing and intelligent.[29] However, the absence of counsel alone does not warrant remand. A claimant must prove unfairness at the hearing or clear prejudice resulting from the absence of counsel before a due process violation is found and a remand will be granted.[30]

Here, Plaintiff received no less than three (3) written notices that advised her of her right to counsel. The notice of reconsideration from the Commissioner dated April 8, 2002 (R. 37 - 38), notified Plaintiff of her right to appeal and request an administrative hearing, and specifically stated that:

---

[27] Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995) *Citing* 42 U.S.C. § 406; Smith v. Schweiker, 677 F. 2d 826, 828 (11th Cir. 1882).

[28] Clark v. Schweiker, 652 F. 2d 399, 403 (5th Cir. 1981). In Bonner v. Prichard, 661 F. 2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[29] Smith v. Schweiker, 677 F.2d 826, 828 (11th Cir. 1982.)

[30] Kelley v. Heckler, 761 F. 2d 1538, 1540 (11th Cir. 1985).

14

You can have a friend, lawyer, or someone else help you.  There are groups that can help you find a lawyer or give you free legal services if you qualify.  There are also lawyers who do not charge unless you win your appeal.  Your local Social Security Office has a list of groups that can help you with your appeal . . . If you hire someone, we must approve the fee before he or she can collect it.  And if you hire a lawyer, we will withhold up to 25 percent of any past due Social Security benefits to pay toward the fee.

(R.  38.)[31]

A second notice, dated June 8, 2002 (more than two months before the hearing),

was included in the acknowledgment of her request for a hearing. (R. 34-35.)  The

notice specifically stated the following:

### Your Right to Representation

You may choose to be represented by a lawyer or other person. A representative can help you get evidence, prepare for the hearing, and present your case at the hearing. [...]. Some private lawyers charge a fee only if you receive benefits. Some organizations may be able to represent you free of charge. Your representative may not charge or receive any fee unless we approve it. We have enclosed the leaflet "Social Security and Your Right to Representation." We are also enclosing a list of groups that can help you find a representative."

(R. 34.)

Finally, a third notice of Plaintiff's right to counsel was included on the Notice of

Hearing dated August 13, 2002 (R. 28-31.)  The notice reminded Plaintiff that she may

choose to have a person represent her at the hearing, and directed her to obtain a

representative right away if she wanted such representation. (R. 29.)

In addition to these written notices, the ALJ reminded Plaintiff of her right to

counsel and gave her another opportunity to obtain counsel before continuing with the

---

[31] The notice of disapproved claim from the Commissioner dated January 11, 2002 (R. 42-43) also advised Plaintiff of her right to appeal and included the same language quoted above.

hearing. At the inception of the hearing, the ALJ stated on the record that Plaintiff was without a lawyer. (R. 299.) He stated that Plaintiff had been notified in the Notice of Hearing that she had the right to be represented by a lawyer. (*Id.*)  He then noted that Plaintiff brought to the hearing a letter from an attorney in which the attorney wanted Plaintiff to put the money up front for a consultative examination.  (*Id.*).  The ALJ then specifically asked Plaintiff if she wanted to delay the hearing until she got a representative. (*Id.*) Plaintiff stated that she did not want to delay the hearing. (R. 299-30.)  The ALJ then asked Plaintiff " [a]nd you feel as though you can explain the situation," to which Plaintiff responded in the affirmative.  (R. 300.)

In view of the foregoing, the Court concludes that Plaintiff knowingly and voluntarily waived her statutory right to counsel.  Moreover, even if the Court were to conclude that Plaintiff did not effectively waive her right to legal counsel, Plaintiff has failed to show, much less argue,[32] that the absence of legal counsel prejudiced her claim for benefits.

As part of its inquiry into the possible prejudice to Plaintiff due to her lack of counsel, the Court need not determine "that the presence of counsel would necessarily have resulted in specific benefits in the handling of the case before the ALJ."[33] However,

_____

[32]  Although Plaintiff dedicates almost 5 pages of her brief to the argument that the ALJ failed to adequately advise her of her right to counsel, there is no argument as to how her claim for benefits was prejudiced by her lack of legal counsel.  (Doc. 16, pages 9-13). The bulk of the 5 pages is comprised of lengthy excerpts from the hearing transcript and case citations without any application to the facts of this case.  Moreover, Plaintiff devotes more than one half of a page to a "Mr. Smith" who has no relationship to this case.  The only suggestion of prejudice is Plaintiff's vague contention that  the ALJ failed to develop the record and order medical tests and examinations.  However, she fails to identify any gaps in the evidence or any necessary medical tests or examinations that the ALJ failed to order.

[33] Brown at 935. *Quoting* Clark at 404.

there must be a showing of prejudice for a court to conclude that a claimant's right to due process has been violated to such a degree that the case must be remanded.[34] A showing by Plaintiff of evidentiary gaps in the record will suffice.[35]  Here, Plaintiff has failed to make such a showing.  Moreover, Defendant has pointed to ample evidence of record which shows that the ALJ went to great lengths to fill any evidentiary gaps in the record before issuing his decision.

It is well-settled that an ALJ has a basic obligation to fully and fairly develop the record.[36] This obligation exists whether or not a claimant is represented by counsel.[37] As a hearing is non-adversarial in nature,[38] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[39] The Court is mindful that where the right to counsel has not been effectively waived (*i.e.*, was not a knowing and intelligent waiver), the ALJ's basic obligation "rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appears before him."[40]

As noted above, the ALJ in this case adequately discharged his duties - even that "special duty" that arises in the wake of an ineffective waiver of counsel. The ALJ

---

[34] *Id.*

[35] *Id.* at 935-936.

[36] *See* Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981); *See Also* Zaldivar v. Apfel, 81 F.Supp.2d 1353, 1359 (N.D. Ga. 2000).

[37] Zaldivar at 1359.

[38] *Id.*

[39] *See* Mason v. Barnhart, 63 Fed. Appx. 284, 2003 WL 1793283, *2 (9th Cir. 2003).

[40] Cowart at 735. *Quoting* Clark at 404.

scrupulously inquired into and gathered evidence that gave him the opportunity to assess whether any of the alleged impairments in this case constituted a disability as defined by the Act.

Initially, the hearing transcript demonstrates that the ALJ probed into the extent of Plaintiff's alleged headaches and neck pain. (315-18, 322-25), the treatments for her alleged impairments (R. 310-11, 316-18, 323-24, 326-27), and Plaintiff's activities of daily living (R. 320-23, 327.)

The evidence gathered and placed into the record by the ALJ includes voluminous medical records stretching from July 1999 ( R. 144) up to and including July 2002. (R. 262 - 264.)  This includes records from Plaintiff's most recent visit with her treating physician, Dr. Wierzbicki[41]  and a letter dated July 22, 2002 from Dr. Wierzbicki discussing Plaintiff's condition.  (R. 164-65, 317-19.)

Plaintiff submitted numerous statements from family and friends describing her pain and limitations.  (R. 134-141.)  She also submitted her journal for the period from December 2001 through August 2002.  (R. 93-133.)

The ALJ also asked Plaintiff why the attorney she had consulted suggested "the psychiatric."  (R. 319.)[42]   Plaintiff testified that she did not know.  (*Id.*)  Plaintiff testified that she has never been treated by a psychiatrist, psychologist or mental health clinic. (R. 321.)  Plaintiff testified that she has been under counseling with a minister from

---

[41] During the course of the hearing, the ALJ gave Plaintiff the opportunity to submit records from her most recent appointment with Dr. Wierzbicki.  (R. ).  Apparently she submitted the records because there is a "Followup Note" from her June 24, 2002 appointment in the record. (R. 165).  This "Followup Note" is date-stamped as received on August 30, 2002, which was several days after the hearing.

[42] Presumably, the ALJ was referring to the letter brought by Plaintiff to the hearing in which the attorney stated that Plaintiff would need to put the money up front for a "consultative examination."  (R. 299.)

Golden Eagle Ministry.  (R. 319.)  Plaintiff further testified that she gets depressed because she cannot work and that she takes "Hamelor" for her depression.  (R. 319-20.)[43]  However, there is no medical evidence in the record to suggest that Plaintiff was prescribed medication to treat any alleged depression.[44]

In light of the foregoing, Plaintiff has failed to demonstrate evidentiary gaps in the record which may have worked a prejudice upon her claim for benefits, and she has failed to show that the ALJ needed to do more to develop a full and fair record.  Indeed, the record contained ample, current, and consistent information for the ALJ to make an informed decision.

### B. The ALJ Properly Discounted Plaintiff's Testimony of Disabling Pain

As an initial matter, Plaintiff contends that the ALJ improperly acted as both a judge and a physician when he questioned Plaintiff about her neck pain.[45]  Plaintiff objects to the following portion of the hearing transcript:

> Q:   So the neck pain is distinguished form the headache, okay?  Let's focus on the neck pain.  On a scale of one to ten, one being nothing and ten being very severe.  The neck pain intensity would be what rate, what level?
>
> A:   Between an eight and a ten.
>
> Q:   That's severe, give me a shot of Demerol, knock me out.
>
> . . .

---

[43] "Hamelor" is probably a typographical error because "Pamelor" rather than "Hamelor" was prescribed to Plaintiff. (R. 184.)

[44] Based on the Court's review of the record it appears as though Pamelor was prescribed for Plaintiff's headaches.  (R.  184, 232.)

[45] See Doc. 16, pages 14-15.

Q:     When is the last time you had that level of pain, that severe level of pain?

A:     Right now.

Q:     Well you're not suffering that pain now?

A:     Yes.  My neck is killing me, right now. . .

(R. 324-25.)

It is improper for an ALJ to engage in "sit and squirm" jurisprudence.  That is, the ALJ cannot develop his own criteria for measuring a claimant's pain.[46]   Here, the ALJ did not engage in "sit and squirm" jurisprudence.  The ALJ asked Plaintiff several questions to quantify what her subjective pain rating of "between an eight and a ten" actually meant.  The ALJ also questioned whether Plaintiff was experiencing that severe level of pain during the hearing.  However, the ALJ does not refer to his own personal perceptions of Plaintiff's pain in his Decision.[47]  Moreover, as discussed below, there is substantial evidence to support the ALJ's decision to discredit Plaintiff's complaints of disabling headaches and neck pain.

Plaintiff argues that the ALJ erred by rejecting her pain testimony in light of substantial evidence supporting her cervical pain syndrome and migraine headaches.[48]

---

[46]  *See* Jones v. Bowen, 821 F.2d 551, 557 (11th Cir. 1987); Wilson v. Heckler, 734 F.2d 513, 517-18 (11th Cir. 1984).

[47]  *See* Jones, 821 F.2d at 557 (improper for ALJ to determine claimant did not suffer disabling pain because of her lack of personal discomfort during hearing, her lack of obvious abnormalities and her 'fairly even weight record.'); Wilson, 734 F.2d at 518 ( improper for ALJ to determine claimant did not have disabling pain because he did not appear to be in great pain at the hearing)

[48]  *See* Doc. 16, page 15-16.

Pain is a non-exertional impairment.[49] Congress has determined that a claimant will not be considered disabled unless she furnishes medical and other evidence (*e.g.*, medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.[50] Pain alone can be disabling, even when its existence is unsupported by objective evidence,[51] although an individual's statements regarding pain do not provide conclusive evidence of a disability.[52] The ALJ must consider all of a claimant's statements about her symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[53]

An ALJ must apply the Eleventh Circuit's "pain standard" when, as here, a claimant attempts to establish a disability through her own testimony of pain or other subjective symptoms.[54] In order to establish a disability based on testimony of pain and other symptoms, the pain standard requires: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical

---

[49] Foote, 67 F.3d at 1559.

[50] 42 U.S.C. § 423(d)(5)(A).

[51] *See* Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).

[52] 42 U.S.C. § 423(d)(5)(A).

[53] 20 C.F.R. § 404.1528.

[54] Foote at 1560.

condition is of such a severity that it can be reasonably expected to give rise to the

alleged pain.[55]

In the instant case, it appears as though the ALJ applied the Eleventh Circuit's

pain standard "threshold"[56] assessment to Plaintiff's subjective complaints by noting the

Plaintiff's complaints of headaches and neck pain.  (R. 18.)[57]  Once Plaintiff met this

initial burden, however, the ALJ found that "[Plaintiff's] allegations regarding her

limitations are not consistent with the medical evidence, and therefore are not fully

credible.   Considering the objective laboratory and clinical findings, the [Plaintiff's]

subjective complaints are beyond those, which could reasonably be expected in terms

of intensity, frequency and duration."  (R. 21.)

The Eleventh Circuit has stated that where an ALJ discredits a claimant's

testimony about subjective complaints, he must articulate explicit and adequate reasons

for doing so,[58] or the record must be obvious as to the credibility finding.[59] While an

adequate credibility finding need not cite "particular phrases or formulations [...] broad

findings that a claimant lacked credibility and could return to her past work alone are not

---

[55] Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).

[56] Marbury, 957 F.2d at 839.

[57] While the ALJ did not cite the exact language of the standard, he did state that he "must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §§ 404.1529 and Social Security Ruling 96-7p." (R. 376.)  This language, a paraphrase of the pain standard, along with the supporting findings, shows that the ALJ applied the pain standard.  Moreover, the ALJ cited 20 C.F.R. § 404.1529 which contains the same language regarding subjective testimony that the Eleventh Circuit interpreted when initially establishing the pain standard.

[58] Wilson at 1225.

[59] Foote at 1561-62;  Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[60] As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.[61] A Court will not disturb a clearly articulated credibility finding supported by substantial evidence of record.[62]

The Court finds that the ALJ *did* articulate explicit and adequate reasons to discredit Plaintiff's testimony about disabling pain, and further finds that the ALJ's reasons are supported by substantial evidence of record.

The ALJ accurately referenced the medical records kept by two treating physicians, Dr. Bowden and Dr. Wierzbicki. (R. 16-17, 19-20.)[63]  He also accurately referenced the medical records kept by Halifax.  (R. 16.)

The ALJ correctly noted that Plaintiff's treating physicians believed her headaches continued to be problematic due to non-compliance issues.  (R. 18-19). Plaintiff failed to comply with the physicians recommendations -- i.e., quit smoking cigarettes, reduce caffeine intake, cut down on over-the-counter analgesics and get the proper amount of sleep.  (R. 167, 169, 174, 176-77.)  Plaintiff reportedly lived in a trailer home with a group of friends, with too much noise and "excessive things" happened during the evening which prevented her from getting the proper amount of sleep.  (R.

---

[60] Foote at 1562-1563.

[61] Id. at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[62] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[63] The ALJ incorrectly states that Dr. Bowden conducted several examinations that were in fact conducted by Dr. Wierzbicki.  However, the ALJ accurately stated what occurred at these examinations.

176.)  Plaintiff also reported that driving, either by motorcycle or automobile, from her new home in Ocala to Dr. Wierzbicki's office in Ormond Beach aggravated her neck pain.  (R. 169.)

Additionally, the ALJ noted that Plaintiff failed to follow her prescribed treatment. (R.18-19.)   Plaintiff would not call in for refills but instead, she would wait until her next scheduled appointment.    (R. 174.)  The ALJ found her assertions that she was unable to follow prescribed treatments due to finances not credible.  (R. 18-19.)  The ALJ noted that in May 2001 she was building a home and in March 2002 she was actively participating in Bike Week.  (R. 18-19.)  Moreover, the ALJ noted that Plaintiff's condition improved when she followed the doctor's recommendations and prescribed treatments.  (R. 19.)

The ALJ also noted that despite the alleged pain, Plaintiff continued to have a fairly active lifestyle.  (*Id.*)  In January 2001, Dr. Wierzbicki noted that he was "not sure how severe her headache pain really is" because it did not appear to impair her abilities to do the things she enjoys.  (R. 177.)  She advised Dr. Wierzbicki that she was starting a motorcycle training course, and she believed it was "doable" despite her health complaints.  (*Id.*)  She also actively participated in Bike Week (R. 166) and attended Native American Pow Wows. (R. 317.)   Plaintiff reported that she and her fiance had been issued a business license to start an internet dating service. (R. 66.)  The ALJ noted that Plaintiff was able to shower and dress herself daily, cook most meals, clean up the kitchen and do other household chores, including vacuuming and making beds. (R. 19-20, 81, 91-92.)  Plaintiff also shops and visits with friends and family. (R. 81, 91-

92.)  She enjoys watching television and reading magazines and has no problem

managing her money. (R. 81, 91-92.)

The ALJ considered Dr. Wierzbicki's July 22, 2002 letter.  (R. 20.)  However, he

accorded it no significant weight because Dr. Wierzbicki failed to provide clinical or

laboratory findings in support of his opinion.  (*Id.*)  Moreover, the ALJ concluded that Dr.

Wierzbicki's statement that Plaintiff had cervical spondylosis with spinal cord stenosis

was entirely inconsistent with the diagnostic studies in the record. (*Id.*)[64]

It follows that the ALJ explicitly and adequately articulated reasons to discredit

Plaintiff's complaints of disabling headaches and neck pain, and all of the reasons the

ALJ used to discredit such complaints are amply supported by the record. Because the

task of choosing between conflicting evidence is one that is peculiarly suited to the fact

finder,[65] and because there is substantial evidence that supports the ALJ's decision to

discredit Plaintiff's complaints of disabling headaches and neck pain, the Court will not

disturb the ALJ's determination that Plaintiff's headaches and neck pain were not so

severe as to preclude her from performing her past relevant work.

### C. The Appeals Council did not err by refusing review

---

[64] Apparently, the ALJ was referring to the records from Plaintiff's hospitalization in March 2001 for DHE headache management.  (R. 215).  This is the only reference the Court has found to cervical spondylosis and spinal cord stenosis.  Cervical spondylosis is a degenerative disease of the vertebrae of the neck affecting the joints (between the vertebrae), the disks between the vertebrae, and the surrounding ligaments and connective tissue.  1-C-CG Attorneys'Dictionary of Medicine 3933.  There are no diagnostic tests in the record supporting Dr. Wierzbicki's statement.  After reviewing her January 31, 2001 cervical spine radiographs, Dr. Wierzbicki noted that there was a "significant amount of straightening of the normal cervical lordosis."  (R. 177) After reviewing her August 22, 2001 MRI, Dr. Wierzbicki noted that it shows a "fairly stable cervical spine" and there was "no evidence of cervical canal stenosis or any nerve entrapment problems." (R. 169.)

[65] Hand v. Heckler, 761 F. 2d 1545,1549 (11th Cir. 1985).

Plaintiff argues that the Appeals Council erred by denying Plaintiff's request for review after she submitted new evidence.[66]  Although Plaintiff submitted several different documents (R. 274-96),[67] she only addresses the evidence reflecting her appointment with Marc Sharfman, M.D. of the Headache and Neurological Treatment Institute on May 13, 2003. (R. 279-81.)  Plaintiff contends that the treatment note from her May 13, 2003 appointment, is additional proof of her severe pain and that the Appeals Council should have remanded this matter to the ALJ for proper evaluation of her pain.

When the Appeals Council denies review as it did here, the decision of the ALJ becomes the final decision of the Commissioner.[68]  Furthermore, the evidence which was presented to the Appeals Council and not presented to the ALJ (*i.e.*, the new evidence) is incorporated into the record on appeal,[69] and is properly considered by the court where  the claimant appeals the Appeals Council's decision to deny review.[70]

---

[66] *See* Doc. 16, pages 18-19.

[67] Plaintiff filed additional records from the Headache and Neurological Treatment Institute (R.275-78, 282-83)  and records from the Marion County Health Department (R. 284-96.)

[68] Falge v. Apfel, 150 F. 3d 1320, 1322 (11th Cir. 1998) *Citing* Keeton v. Dept. of Health and Human Servs., 21 F. 3d 1064, 1066 (11th Cir. 1994).

[69] *Id.*

[70] *See* Baguer v. Apfel, 65 F. Supp 2d 1345, 1354 (M.D. Fla. 1999)("The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering by not acting on evidence that shows in retrospect that the ALJ's action, findings, or conclusions are contrary to the weight of the evidence currently of record.")

Conversely, it would be improper for the court to consider the new evidence where the claimant appeals only the ALJ's decision to deny benefits.[71]

Here, because Plaintiff directly challenges the decision of the Appeals Council denying review of her case, Plaintiff must make a three-part showing to show that remand is appropriate. First, she must show that new, non-cumulative evidence exists. Second, she must show that the evidence is material such that a reasonable possibility exists that the new evidence would change the administrative result. Finally, she must demonstrate that good cause exists for her failure to submit the evidence at the appropriate administrative level.[72]  Other than quoting portions of the treatment note,[73] Plaintiff has failed to make any showing as to why this "evidence" is material or how it could have reasonably changed the administrative result.

Although the treatment note post-dated the decision of the ALJ, most of the information contained in the note was not really new.  The treatment note documents Plaintiff's self-reported medical, familial, and social history, memorializes her subjective complaints, and reiterates the course of her medical treatment and medical testing.  The

---

[71] Falge at 1323. "[...] this will be our rule: when the AC has denied review, we will look only to the evidence actually presented to the ALJ *in determining whether the ALJ's decision is supported by substantial evidence*." (emphasis added).

[72] Falge at 1323. *Citing* Cannon v. Bowen, 858 F. 2d 1541 (11th Cir. 1988).

[73] Plaintiff quotes four sections of the treatment note.  The first section is entitled "HEAD/FACE/TMJ" and states "Atraumatic, normocephalic.  Exquisite tenderness with trigger point at the insertion of the right trapezius musculature.  There is elevation of the right trapezius muscle with significant spasm compared to the left."   The second section is entitled "MUSCULOSKELETAL CERVICAL SPINE" and states "Involuntary range of motion is severely decreased right greater than left.  There is severe spinal percussion tenderness and muscle spasm right greater than left."  The third section is entitled "IMPRESSION" and states "A 35-year-old with a normal neurologic examination and abnormal musculoskeletal examination."  The final section is entitled "DIFFERENTIAL DIAGNOSES BASED ON INFORMATION AVAILABLE" and identifies five conditions: (1) Intractable common migraine; (2) cervicocranial syndrome; (3) cervicobrachial syndrome; (4) cervicalgia; and (5) muscle contraction headache."

results of her physical examination by Dr. Sharfman are largely consistent with those from earlier examinations prior to the ALJ's decision.  Moreover, Plaintiff has failed to explain how the results of the physical examination are material or how they could have reasonably changed the administrative result.

Additionally, the treatment note contains no discussion of Plaintiff's work-related limitations. Dr. Sharfman makes the conclusory statement that Plaintiff "appears disabled based on information available."  (R. 281.)  However, even if Dr. Sharfman considered Plaintiff disabled as the term is defined under the Act, that assessment is to be made solely by the ALJ and not by a treating physician.[74]

Accordingly, Plaintiff's contention that the Appeals Council erred by denying review of her case is rejected because Plaintiff has failed to show that a reasonable possibility exists that the new evidence would change the administrative result.

## VIII. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Ocala, Florida, on August 30, 2005.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:
    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record

---

[74] *See* SSR 96-5P *citing* 20 C.F.R. 404.1545, 404.1546, 416.945 and 416.946. The regulations caution against even giving controlling weight to the opinion of a treating medical source as to an RFC determination because to do so, "would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled."